# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS SHEPPARD, JR., | : | Case No. 1:13-CV-00789 |
| PLAINTIFF, | : | |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | MEMORANDUM DECISION AND ORDER |
| DEFENDANT. | : | |

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C § 636(c) and FED. R. CIV. P. 73, the parties in this case voluntarily consent to have the undersigned United States Magistrate Judge conduct any and all proceedings in the case, including ordering the entry of a final judgment. Plaintiff seeks judicial review of Defendant's final determination denying her claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act); and Supplemental Security Income (SSI) under Title XVI of the Act. Pending are the Briefs on the Merits of the parties and Plaintiff's Reply (Docket Nos. 17, 18 & 19). For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On November 30, 2004, Plaintiff protectively filed an application for a period of disability and DIB. On December 10, 2004, Plaintiff protectively filed an application for SSI[1] (Tr. 647-648). The application for DIB alleged disability beginning on September 6, 2004[2]. The application for SSI alleged disability beginning on October 17, 2004. The applications were denied initially and upon reconsideration (Tr. 64-65; 68-70; 651-653; 655-657). On July 11, 2005, Plaintiff filed an application for Medicare Qualified Government Employee benefits under Title II of the Act, alleging disability beginning on September 6, 2004 (Tr. 15). This application was consolidated with the other applications discussed above (Tr. 15).

Plaintiff filed a timely written request for hearing and on May 15, 2008, Administrative Law Judge (ALJ) James A. Horn held a video hearing at which Plaintiff, represented by counsel, appeared in Cleveland, Ohio, and ALJ Horn presided over the hearing from Oak Brook, Illinois (Tr. 53). On August 27, 2008, ALJ Horn issued a decision denying Plaintiff's application for DIB and SSI (Tr. 53-59; 64-66; 68-70; 90-93).

Plaintiff filed a timely request for review by the Appeals Council and on July 14, 2010, the Appeals Council vacated the August 27, 2008- decision and remanded the case to the Commissioner for:

(1)     consideration of new evidence that was filed in connection with the pending claim;
(2)     an adequate evaluation of Plaintiff's subjective complaints; and

---

[1]

The ALJ found that both applications were protectively filed on November 30, 2004. The application in the file shows that the application was filed with the Social Security Administration on December 10, 2004 (Tr. 647).

[2]

This date was relied upon by the ALJ (Tr. 15).

(3)     consideration of the impact that the subjective complaints had on Plaintiff's residual functional capacity (Tr. 61-62).

On November 7, 2011, Plaintiff, represented by counsel; Dr. Cathy Krosky, M. D., an impartial medical expert (ME); and Lynn Smith, an impartial vocational expert (VE), appeared before Administrative Law Judge Peter R. Bronson in Cleveland, Ohio, at a supplemental hearing.  On December 29, 2011, ALJ Bronson determined that Plaintiff had not been under a disability from September 6, 2004 through the date of the decision (Tr. 15-32).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on March 2, 2013 (Tr. 3-5).  Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

### III.  FACTUAL BACKGROUND.

### 1.     PLAINTIFF'S TESTIMONY.

Plaintiff was 44 years of age at the time of hearing.  He completed high school but did not seek further education (Tr. 678).  Plaintiff testified that he had not used marijuana and alcohol for the last four and seven years, respectively (Tr. 680).  The last time Plaintiff worked was in November 2004.  He claimed that he could no longer work because of congestive heart failure, hypertension and a renal problem (Tr. 678-679).

Plaintiff estimated that he could lift a five-pound bag of sugar and a gallon of milk (8.6 pounds).  He could not lift a twenty-pound bag of potatoes without difficultly.  He could walk about a quarter mile, stand in one place, and sit for one half hour.  Plaintiff had difficulty breathing after climbing steps.  Plaintiff could stoop, crouch, squat, crawl, bend and kneel but not for prolonged periods of time (Tr. 679, 680).

Over the last 11 years, Plaintiff had difficulty "getting used to" the medication prescribed.

Admittedly, his symptoms were controlled when he took the medication; however, the side effects were grave.  He felt zombie-like and his ability to respond to environmental stimuli or breathe normally was affected by the medication.  Plaintiff was persuaded that long term usage of the medications had resulted in kidney dysfunction and recently he had consulted with a nephrologist (Tr. 680, 681, 683).

2.      **THE ME'S TESTIMONY**.

The ME, a board certified physician in family medicine, testified that she had reviewed the medical evidence in the record and summarized the diagnoses accordingly:

1.      Hypertensive cardiomyopathy with chronic congestive heart failure.
2.      Underlying chronic hypertension (Tr. 685).

The ME conducted a comprehensive review of the chronology of symptoms and treatments, including Plaintiff's cardiac disease, drug and alcohol usage, chronic bronchitis, obesity, hypertension and functional limitations resulting therefrom (Tr. 686-698).  The ME could not fit Plaintiff into a "meets or equals" analogy because most of the Listing requires periods of stability that occur "not during a period of exacerbation" (Tr. 698).

Regarding Plaintiff's residual functional capacity or the most a claimant can still do in a work setting despite his physical and mental limitations, the ME limited Plaintiff to sedentary work, at most, subject to the following:

1.      No pushing or pulling of his arms or legs.
2.      No climbing using a ladder, rope or scaffold.
3.      Climbing stairs incorporating a period of rest.
4.      Occasional stooping or crouching.
5.      No balancing.
6.      Avoid cold, heat, humidity and hazards of all sorts, including but not limited to unprotected heights and commercial driving (Tr. 699-700).

4

**3.**     **THE VE'S TESTIMONY**.

A vocational rehabilitation counsel for approximately thirty years, the VE categorized Plaintiff's past relevant work as that of a laborer, having constructed sets for events in the City of Cleveland (Tr. 702).

In the first hypothetical, the ALJ asked that the VE:

> . . . .Assume a person whose date of birth is May 7, 1967.  Someone who's a high school graduate and someone whose past relevant work was what his claimant's past relevant work was. . . . This person is limited to sedentary work only with all that implies with respect to exertional and postural limitations subject to the following additional limitations.  The hypothetical person has a sit/stand option.  The hypothetical person cannot climb steps, ramps, ladders, ropes, or scaffolds.  Cannot (1) push or pull with either arm or either leg; . . . .(2) balance; . . . .(3) work in proximity to unprotected heights, dangerous moving machinery or other workplace hazards; . . . .(4) operate a motor vehicle as part of a job; work in an environment where there is exposure to fumes, chemicals, dust, or agricultural or landscaping pollens and concentrations that exceed what would be in the environment outside of or away from the workplace; .. . . and (5) work in an environment where there is exposure to extremes of heat, cold, or humidity.

This hypothetical person could not perform Plaintiff's past relevant work because it was performed at a very heavy level.  However, there were sedentary, unskilled jobs that the hypothetical person could perform.  Specifically, there were three jobs identified in the Dictionary of Occupational Titles (DOT), a publication that provides a snapshot of jobs and how they are performed in the majority of industries, that the hypothetical person could perform after the initial preparation that could be achieved after a short demonstration or up to and including one month of preparation:

| JOB/DOT | NUMBER OF JOBS IN LOCAL AREA | NUMBER OF JOBS IN THE STATE OF OHIO/NATIONALLY |
|---|---|---|
| INSPECTOR 713.687-022 | 3,300 | 17,000/300,000 |
| TICKET CHECKER 219.587-010 | 7,000 | 70,000/1.8 MILLION |

| | | |
|---|---|---|
| ORDER CLERK 209.567-014 | 2,600 | 9,000/260,000 |

The VE admitted that she did not have data distinguishing the number of jobs as part-time or full-time.  She explained that the DOT did not recognize or quantify the number of jobs that required a sit/stand option (Tr. 702-703; 704-705; www.onetonline.org/help/online/svp; www.occupational info.org ).

IV.  **MEDICAL EVIDENCE**.

On June 28, 2004, the level of waste product creatinine in Plaintiff's blood and urine was higher than the set values used by health professionals to interpret what is most prevalent in the reference group.  Plaintiff's levels of anion gap and calcium were lower than the values used to interpret what is most prevalent in the reference group (Tr. 366).

Plaintiff presented to the Euclid Hospital-Cleveland Clinic Emergency Room on November 25, 2004, complaining of dyspnea, dyspnea on exertion and weakness.  Plaintiff was admitted to the hospital due to his history of uncontrolled hypertension, drug abuse, renal insufficiency and congestive heart failure.  Several diagnostic studies, including pulmonary and renal studies, were administered and various treatments were used to moderate elevated levels of glucose, blood urea nitrogen and creatinine, platelets, bilirubin and bad cholesterol level.  Plaintiff's liver showed fatty metapophysis; the nonspecific bowel gas pattern was without evidence of obstruction and the heart showed severe global hypokinesis/akinesis of the left ventricle.  Plaintiff's kidneys were not symmetrical in length and there was suspicion of a mass lesion.  On December 3, 2004,  Plaintiff was transferred to the Cleveland Clinic Foundation (CCF) (Tr. 133- 138; 142-164; 174-l81; 182-189; 190-362, 383)

When admitted  to the Cleveland Clinic  (CCF), Plaintiff was complaining of chest pain, dyspnea and dizziness.  An echocardiogram was performed on December 4, 2004 and a cardiology catherization was administered on December 6, 2004.  Results showed elevated pulmonary capillary wedge pressure and normal coronary arteries.  The treatment plan included aggressive coronary heart failure treatment, including addressing hypertension and abstaining from the use of illicit drugs. Plaintiff was discharged on December 7, 2004 .  (Tr. 368-378).

Plaintiff presented to the CCF on December 28, 2004, for follow-up care after his hospitalization in December 2004.  Plaintiff was diagnosed with severe hypertension, non-ischemic cardiomyopathy[3], mild renal insufficiency and a history of multi-substance abuse.  He was given the customary medications to control angina and hypertension (Tr. 383-390).

On March 19, 2005, Plaintiff presented to the emergency room at Euclid Hospital with a cough and nasal congestion.  He was treated for an upper respiratory infection and bronchitis (Tr. 393-402).

Charles Derrow completed a PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT on April 12, 2005.  Based on all of the evidence in the file and his own reasoned judgment, he concluded the following:

---

[3]

**non-ischemic cardiomyopathy** includes four types of heart muscle disease.  These forms of cardiomyopathy are not related to coronary artery disease (poor coronary artery blood supply):

    (1)    Dilated cardiomyopathy–the heart's ability to pump blood is decreased because the heart's main pumping chamber, the left ventricle, is enlarged, dilated and weak.

    (2)    **Hypertrophic cardiomyopathy**-- a complex type of heart disease that affects the heart muscle.  It causes thickening of the heart muscle (especially the ventricles, or lower heart chambers), left ventricular stiffness, mitral valve changes and cellular changes.

    (3)    **Restrictive cardiomyopathy**–the rarest form of cardiomyopathy, is a condition in which the walls of the lower chambers of the heart (ventricles) are abnormally rigid and lack the flexibility to expand as the ventricles fill with blood.

    (4)    Arrhythmogenic right ventricular dysplasia is a rare form of cardiomyopathy in which the heart muscle of the right ventricle is replaced by fat and/or fibrous tissue, resulting in a weakened ability of the heart to pump blood.  Http://my.clevelandclinic.org/heart/disorders/heartfailure/arvd.aspx.

1.  Plaintiff could occasionally lift and/or carry 20 pounds.
2.  Plaintiff could frequently lift and/or carry 10 pounds.
3.  Plaintiff could stand and/or walk for a total of about six hours in an eight-hour workday.
4.  Plaintiff could sit about six hours in an eight-hour workday.
5.  Plaintiff could engage in unlimited, other than as shown for lift and/or carry, pushing and pulling.
6.  Plaintiff could never climb using a ladder/rope/scaffold.
7.  Plaintiff must avoid concentrated exposure to extreme cold, extreme heat and humidity (Tr. 404, 405, 407).

Plaintiff presented to the Cleveland Clinic Health System--Huron Hospital (CCHS) on June 24, 2005, to undergo an echocardiogram.  There was evidence of a mildly dilated right ventricle, minimal dilation of the left atrium, mild mitral regurgitation, mild tricuspid regurgitation and an estimated ejection fraction between 20-25%, a percentage that generally showed some heart failure (Tr. 422-424).

On September 22, 2005, Plaintiff went to CCHS, complaining of abdominal pain.  Plaintiff had run out of medicine about a week prior.  Dr. Camelia Raiu, M. D., noted that Plaintiff's blood pressure was uncontrolled due to lack of medication.  Similarly, his congestive heart failure was mildly exacerbated due to lack of medication.  Plaintiff was started on his medications and new diagnostic tests were ordered (Tr. 411-421).

Plaintiff returned to the Cleveland Clinic on August 18, 2006, complaining that his breathing ability and energy levels had worsened since his last visit on December 21, 2004.  Plaintiff's hypertension was well controlled and he was continued on a diuretic.  Laboratory work was conducted and the results showed occasional premature ventricular complexes; elevated mean platelet volume and creatinine levels that exceeded the set values used by health professionals to interpret what is most prevalent in the reference group (Tr. 460-461; 463; 464).

On September 20, 2006, Plaintiff went to the Cleveland Clinic for a follow-up from his August 31, 2006 visit. In the interim,  Plaintiff had not had any emergency room encounters and/or hospitalizations.  He was in a stable condition (Tr. 455-456).

 When Plaintiff appeared at  the Cleveland Clinic on October 11, 2006, his  hypertension was uncontrolled; however,   fifteen minutes after taking medication, his blood pressure was lowered (Tr. 452-453).

Plaintiff returned to the Cleveland Clinic on November 27, 2006 for a follow-up visit.  He was instructed to return after taking his medication.  He was already on maximum dosages of cardiovascular disease medication and his blood pressure showed suboptimal improvement (Tr. 447-450).

Plaintiff reported to the Cleveland Clinic on March 22, 2007, for follow-up care after his November 27, 2006-visit.  He had not had any emergency visits or hospitalizations since then.  The attending physician noted that Plaintiff's blood pressure was greatly improved when he took his medication as prescribed (Tr. 445-446).

Plaintiff presented to CCHS on March 26, 2007, complaining of chest pain and shortness of breath.  Plaintiff had been noncompliant with his medication regimen.  His pain was attributed to congestive heart failure exacerbation.  He was discharged with the medications needed and a suggestion that he continue to monitor his blood pressure regularly (Tr. 494-503).

On April 23, 2007,  Plaintiff returned  to the Cleveland Clinic after starting Hydrochlorothiazide, a diuretic used to prevent the body from absorbing too much salt.  Since taking this medication, Plaintiff had only one emergency room visit for chest pain.  Plaintiff's blood urea nitrogen and creatinine levels exceeded the set values used by health professionals to interpret what is most prevalent in the reference group (Tr. 443-444).

9

On August 6, 2007, Plaintiff went to the Cleveland Clinic for a follow-up visit.  At that time, Plaintiff reported no emergency room visits or hospitalizations since June 5, 2007.  Plaintiff's blood urea nitrogen, creatinine and glucose levels exceeded the set values used by health professionals to interpret what is most prevalent in the reference group (Tr. 438-441)

When Plaintiff appeared at  the Cleveland Clinic on October 7, 2007, he complained of shortness of breath and chest pain, both of which started three days prior to his arrival.  A complete work-up was conducted.  There was evidence of rapid heartbeat originating in the sinus node. Plaintiff was diagnosed with acute bronchitis and prescribed a diuretic, a bronchodilator and an antibiotic (Tr. 431-437; 472-473; 479-481;  STEDMAN'S MEDICAL DICTIONARY 398860 (27th ed. 2000)).

Plaintiff was admitted to the Cleveland Clinic on February 13, 2008 for treatment of symptoms related to cardiomyopathy, hypertensive crisis, congestive cardiac failure, chronic renal insufficiency and bronchial asthma.  The echocardiography examination was inconclusive since the technician had difficulty due to body habitus in determining the extent of contrast with other studies. There was evidence of some moderately decreased systolic function in the left ventricle and mild to moderately decreased right ventricle systolic function.  There was also evidence of rapid heartbeat originating in the sinus node.  Plaintiff was restarted on medication.  He was further advised to exercise, cease the use of addictive drugs and to check his blood pressure regularly (Tr. 425-430; 475-477; 487-493; STEDMAN'S MEDICAL DICTIONARY 398860 (27th ed. 2000)).

When Plaintiff went to  CCHS  on February 19, 2009, his blood pressure was elevated even though he represented that he was medication compliant.  Further laboratory tests were ordered (Tr. 579-581).

Plaintiff returned to CCHS on March 17, 2009, for a blood pressure check.  Plaintiff's blood

pressure was slightly elevated at the time of admission but decreased during the visit.  Plaintiff was compliant with his medication and he was also using marijuana (Tr. 574-578).

On May 26, 2009, Plaintiff reported to CCHS with an elevated blood pressure.  Possible causes of the elevated blood pressure were Plaintiff's use of marijuana and alcohol during the preceding weekend (Tr. 567-571)

Plaintiff presented to the CCHS on September 9, 2009, complaining that he may have "cat-scratch disease."  The superficial wounds were cleaned and an antibiotic and a tetanus shot were administered (Tr. 504-511).

On October 24, 2009,  Plaintiff was admitted to CCHS and  treated for complications arising from congestive heart failure and chronic obstructive pulmonary disease (COPD) exacerbation.  Over the course of the next three days, Plaintiff's systems were tested and his medication intake monitored (Tr. 513-530).

From specimens collected on October 25, 2009 by the Ohio Department of Health, "influenza A nucleic acid" and "influenza A(Swine Flu)" were detected (Tr. 640).

Plaintiff reported to CCHS on January 26, 2010, with dyspnea and a cough.  Plaintiff's respiratory function and blood pressure were monitored.  Dr. Andrei C. Brateanu conducted an extensive evaluation of the physician's orders and the medications prescribed.  It was difficult to ascertain the contrast from previous radiological studies of the heart because of Plaintiff's physical and constitutional characteristics.  However, the radiologist was able to determine that Plaintiff's normal left ventricle size showed moderately decreased systolic function and the right ventricle showed mild to moderately decreased systolic function.  Notably, the results from the lipid and metabolic panels showed glucose and red cell distribution width levels that exceeded the range of set values used by health professionals to interpret what is most prevalent in the reference group.

11

Plaintiff's hemoglobin, hematocrit and mean corpuscular volume was lower than the set values used by health professionals to interpret what is most prevalent in the reference group (Tr. 532-546; 619-634).

Plaintiff reported to CCHS on February 2, 2010, for medication refills.  At that time, his lungs were clear and there was no pedal edema.  He was educated about fluid restriction and advised to lose weight (Tr. 563-566).

At CCHS, Dr. Brateanu assessed the present state of Plaintiff's hypertension on March 17, 2010.  Plaintiff had been compliant with his medication and reported no adverse effects.  Plaintiff did report that he continued to have shortness of breath while lying flat and occasional bilateral leg swelling (Tr. 558-562).

On September 15, 2010, Plaintiff presented to the CCHS for refills of his medication.  Plaintiff's sleep apnea was getting better and he had no new complaints (Tr. 553-556).

Carmen Thompson, M. A., at the CCHS, counseled Plaintiff on September 20, 2010, regarding the need to be medication compliant and to complete the requisite blood work before his appointment in January 2011 (Tr. 557).

On November 4, 2010, Dr. Eulogio Sioson, M. D., an internal medicine/pulmonary/geriatric certified independent medical examiner, conducted a clinical examination, physical examination, history evaluation and systems review.  Dr. Sioson made the following diagnoses:

1.  Hypertension/heart/bronchitis–Plaintiff had no overt congestive heart failure–ran out of most medications.
2.  Neck/back/joint pains–Plaintiff had no apparent radiculopathy.

Dr. Sioson conducted manual muscle testing and determined that Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees and feet against maximal resistance.  He further found that Plaintiff's ability to grasp, manipulate, pinch and engage in fine coordination, bilaterally, was

normal.  There was some limited range of motion in the cervical spine, dorsolumbar spine, knees and shoulders.  There was full range of motion in Plaintiff's elbows, wrists, hands-fingers, hips, and ankles.  Considering the limitations of range of motion from pain and these findings, work-related activities would be limited to light or sedentary work (Tr. 583-587).

Plaintiff presented to the emergency room at CCHS on March 18, 2011, with symptoms that were consistent with an upper respiratory infection.  Plaintiff's heart was enlarged and there was some haziness in the lungs, suggestive of edema.  There was mild tortuosity of the aorta but Plaintiff's heart sinus rhythm was normal.  Results from the urinalysis showed a creatinine level that exceeded the set values used by health professionals to interpret what is most prevalent in the reference group.  In addition to the drugs given to treat the symptoms of the upper respiratory infection, Plaintiff's dosage of the diuretic was increased (Tr. 603).

Plaintiff reported to CCHS for hypertension monitoring on March 30, 2011.  He had no new complaints, no chest pain or shortness of breath.  His medications were refilled (Tr. 598-602).

On May 25, 2011, Plaintiff returned to CCHS for a medication check.  He had no new complaints and he was given an order for a sleep study.  His medications were refilled (Tr. 594-597).

Plaintiff went to CCHS on July 28, 2011, to monitor his hypertension and obtain refills.  He participated in patient counseling and he was advised about his laboratory work required before his next appointment (Tr. 589-593).

### V.  THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are found at 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920, respectively.  The statutes are identical for purposes of evaluation.

SSI and DIB are available only for those who have a "disability."  *Colvin v. Barnhart*, 475

13

F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 3d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits  . . . physical or mental ability to do basic work activities." *Id*.  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any

14

point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI. THE ALJ'S FINDINGS.

The ALJ determined that with respect to the application for a period of DIB or disability insurance benefits, Plaintiff was never insured pursuant to the Act.  Therefore, as a matter of law, he was denied DIB benefits without regard to medical or vocational considerations.  For purposes of the application for SSI, Plaintiff met the insured status requirements of the Act through, but not after, December 31, 2009.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings:

Step one:     Plaintiff had not engaged in substantial gainful activity from September 6, 2004, the alleged onset date, through December 29, 2011, the date of the decision.

Step two:     Plaintiff had severe impairments from September 6, 2004 through December 29, 2011, specifically:
a.     Hypertensive cardiomyopathy with chronic congestive heart failure.
b.     Underlying chronic hypertension.
c.     Anemia of undiagnosed etiology.
d.     Sleep apnea.
e.     Recurrent bronchitis and/or COPD.
f.     Obesity.
g.     Marijuana abuse.

For some periods of time, none of which equaled or exceeded 12 consecutive months, from September 6, 2004, through the alleged onset date, through December 29, 2011, Plaintiff had chronic renal insufficiency, which was not a severe impairment.

Step three:   Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Moreover, Plaintiff had the residual functional capacity to perform a full range of sedentary work subject to the following limitations:

a.  Sit/Stand option.
b.  Could not and cannot climb steps, ramps, ladders, ropes or scaffolds.
c.  Could not and cannot push or pull with either arm or either leg.
d.  Could not and cannot balance.
e.  Could not and cannot work in proximity to unprotected heights, dangerous moving machinery or other workplace hazards.
f.  Could not and cannot operate a motor vehicle as part of a job.
g.  Could not and cannot work in an environment where there would be or could be exposure to fumes, chemicals, dusts or agricultural or landscaping pollens in concentrations that exceed what would be in the environment outside of or away from the workplace.
h.  Could not or cannot work in an environment where there would have been or would be exposure to extremes of heat, cold or humidity.

Step four:    From September 6, 2004 through December 29, 2011, Plaintiff was not and is not able to perform any past relevant work.

Step five:    From September 6, 2004 through December 29, 2011, considering Plaintiff's age, education, work experience and residual functional capacity, there were and are jobs that exist in significant numbers in the national economy that Plaintiff could and can perform.

Conclusion:   Plaintiff has not been under a disability, as defined in the Act from September 6, 2004 through December 29, 2011 (Tr. 15-32).

## VII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011). Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)). The substantial evidence

16

standard requires more than a scintilla, but less than a preponderance of the evidence. *Id*. at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Further, a district court must not focus, or base its decision, on a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)). If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)). Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

17

### VIII. ANALYSIS.

Plaintiff seeks reversal and remand of the ALJ's decision for reasons that:

1.    Plaintiff's residual functional capacity finding is contrary to law because it fails to (a) apply 20 C. F. R. § 404.1527(d); (b) properly evaluate the opinion of Dr. Krosky; and (c) rely on the premise that Plaintiff's inability to perform work on a full-time basis was not his fault.
2.    The ALJ's decision is contrary to law because it failed to take into consideration all of the signs and symptoms that flow from Plaintiff's severe impairments.

In the Brief on the Merits, Defendant responds that:

1.    The ALJ reasonably gave weight to the ME's testimony.
2.    Substantial evidence supports the ALJ's assessment of Plaintiff's failure to follow prescribed treatment.
3.    Substantial evidence supports the ALJ's residual functional capacity assessment and corresponding hypothetical question to the VE.

In the Reply to Defendant's Brief on the Merits, Plaintiff asserts the following claim:

The Commissioner's position that substantial evidence supports the ALJ's finding that jobs exist in significant numbers that Plaintiff could perform without subtracting out of the number, part-time jobs that do not constitute substantial gainful activity, constitutes reversible error.

### 1.    THE WEIGHT GIVEN THE ME'S REPORT.

Plaintiff's first claim challenges the absolute reliance that the ALJ had on the ME's testimony.  Considering that the ME's testimony was both persuasive and highly probative, Plaintiff suggests that the ALJ erred by failing to explain the weight given to the ME's reports under 20 C. F. R. § 404.1527(d).

The Magistrate agrees with Plaintiff that the ALJ had a duty to explain the weight given to Dr. Krosky's testimony concerning Plaintiff's residual functional capacity to work less than 40 hours

per week.  According to 20 C.F.R. § 404.1527, Social Security Ruling (SSR) 96–6p[4], and SSR

96–5p[5], the ALJ cannot ignore the opinion of a ME.  Although the ALJ is not bound by a given

medical opinion, he or she must still explain the weight given to each of those opinions in his or her

decision.  Additionally, the Magistrate agrees that SSR 96–5p requires the ALJ to apply a number

of factors from 20 C.F.R. § 404.1527(d) when weighing a ME's opinion.  These factors are:

    (1)     the examining relationship between the expert and the claimant,
    (2)     the treatment relationship,
    (3)     the supportability of the opinion in medical signs and laboratory findings,
    (4)     the consistency of the opinion with the record as a whole,
    (5)     the expert's specialization, and
    (6)     any other factors influencing the credibility of the opinion.

As discussed above, the ALJ summarized and considered the opinions of Dr. Krosky.

Addressing the factors under Section 1527(d), the ALJ acknowledged that Dr. Krosky was an

impartial medical expert board certified in internal medication and therefore, was a specialist

regarding physical health upon which she provided testimony (Tr. 15).  Plaintiff did not challenge

Dr. Krosky's qualifications to provide medical expert testimony in a social security disability

proceeding.  Dr. Krosky reviewed the medical evidence of record, including Plaintiff's testimony,

and rendered her expert medical opinion based on the totality of the evidence of record.  The ALJ

relied on these opinions, determining that Dr. Krosky's opinions were generally consistent with the

evidence of record (Tr. 28-29).  The ALJ determined, however, that Dr. Krosky's opinions lacked

---

[4]

    POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW, SSR 96–6P (1996).

[5]

    POLICY INTERPRETATION RULING TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER, SSR 96-5p (1996).

the Plaintiff's own perspective of his chronic use of drugs, the physical activity and extended time periods during which Plaintiff was not medication compliant.  The evidence of record demonstrated there were instances when Plaintiff was not doing well but that those instances were not as frequent as Dr. Krosky's opinions implied and most of them were exacerbations that occurred when Plaintiff stopped taking his medication.

The Magistrate finds that overall, Dr. Krosky's opinions were not ignored and that the ALJ explained the weight given to these opinions in his decision.  The ALJ was able to exclude from the residual functional capacity determination that portion of her testimony that was subject to impeachment.  Reversal of the decision is not warranted on account of the ALJ''s failure to explain the weight given to Dr. Krosky's testimony.

## 2. THE REJECTION OF THE ME'S RESIDUAL FUNCTIONAL CAPACITY DETERMINATION.

Plaintiff suggests that the ALJ's residual functional capacity analysis is contrary to law because he rejected the ME's opinion that he did not have the residual functional capacity for full time work.

A person who has no impairment(s) would be able to do all basic work activities at normal levels; he or she would have an unlimited functional capacity to do basic work activities.  20 C. F. R. §§ 404.1594; 416.994 (Thomson Reuters 2013).  What a person can still do despite an impairment, is called his or her residual functional capacity.  20 C. F. R. §§ 404.1594; 416.994 (Thomson Reuters 2013).

The responsibility for determining a claimant's residual functional capacity resides with the ALJ. *Fleischer v. Astrue*, 774 F.Supp.2d 875, 881 (N.D.Ohio,2011) (*see* 20 C.F.R. §§ 404.1546(c)).

20

In rendering a residual functional capacity decision, the ALJ must (1) give some indication of the evidence upon which he or she is relying, and (2) not ignore evidence that does not support the decision, especially when that evidence, if accepted, would change the analysis. *Id.* (*See Bryan v. Commissioner of Social Security*, 383 Fed.Appx. 140, 148 (3rd Cir.2010) (*quoting Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3rd Cir.2000) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [ . . . ] contradictory, objective medical evidence' presented to him.")); *Baltazar v. Astrue*, 2011 U.S. Dist. LEXIS 4641, *22 (W.D.Ark. Jan. 18, 2011) (*citing Pate–Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir.2009); 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2); SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).

The ultimate issue in this case was whether Plaintiff would be able to maintain a full-time job despite the fact that he suffered from hypertensive cardiomyopathy with chronic congestive heart failure, chronic hypertension, anemia, sleep apnea, recurrent bronchitis and COPD. The ALJ called a ME at the administrative hearing, presumably in an effort to answer this question. The ME summarized Plaintiff's medical treatment records and based solely on the history of emergency room care, "doubted" that Plaintiff could sustain work for 40 hours consistently. This statement is ambiguous, without qualification and at odds with the reviewing and examining physicians who tacitly felt that Plaintiff would be able to maintain full-time employment if he were medication compliant and refrained from illicit drug usage. The ALJ considered this premise and then pointed out that there was evidence that Plaintiff smoked marijuana five days per week and drank weekly.

One examiner noted Plaintiff was generally "pretty active" and that Plaintiff selectively reported when he was not taking his medication (Tr. 25).  The ALJ accepted the ME's opinion, and appropriately rejected that portion of the ME's testimony that was inconsistent with the other medical evidence in the record that suggested that Plaintiff's impairments probably did not interfere with his ability to sustain employment if he complied with the medication regime and refrained from the use of illicit drugs.

The rules and regulations that govern social security cases as well as the case law that has developed over the years mandate that an ALJ address the ME's opinion and explain why it is or is not entitled to significant weight.  The ALJ provided clear and convincing reasons for rejecting the ME's opinion, in part, and his decision was not error.  For these reasons, remand is not warranted.

### 3. ALLEGED FAILURE TO FOLLOW PRESCRIBED TREATMENT.

Plaintiff argues that this Court should reject any implication that his failure to religiously take his medication constituted a wilful failure to follow prescribed treatment.

Individuals with a disabling impairment which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment.  Where the individual does not have an attending physician, the treating physician(s) in the hospital, clinic, or other medical facility where the individual goes for medical care will be considered the treating source.  TITLES II AND XVI: FAILURE TO FOLLOW PRESCRIBED TREATMENT, 1982 WL 31384, *1, SSR 82-59 (1982).  Under circumstances such as those described below, an individual's failure to follow prescribed treatment will be generally accepted as "justifiable" and, therefore, such "failure" would not preclude a finding of "disability" or that disability continues.  *Id*. at *3.

22

1. Acceptance of prescribed treatment would be contrary to the teachings and tenets of the claimant's or beneficiary's religion. *Id.*

2. Cataract extraction for one eye is prescribed but the loss of visual efficiency in the other eye is severe and cannot be corrected through treatment. *Id.*

3. In an unusual case, a claimant's or beneficiary's fear of surgery may be so intense and unrelenting that it is, in effect, a contraindication to surgery. *Id.* at *4.

4. The individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable. *Id.*

5. Any duly licensed treating medical source who has treated the claimant or beneficiary advises against the treatment prescribed for the currently disabling condition. Thus, if a person has two treating sources who take opposing views regarding treatment, one recommending and one advising against the same treatment, failure to follow the recommended treatment was justifiable. *Id.*

6. The claimant or beneficiary is presently unable to work because of a condition for which major surgery was performed with unsuccessful results, and additional major surgery is prescribed for the same impairment. *Id.*

7. The treatment carries a high degree of risk because of the enormity or unusual nature of the procedure (e.g., organ transplant, open heart surgery). *Id.*

8. The treatment recommended involves amputation of an extremity (e.g., amputation at or above the tarsal region). *Id.*

Before failure to follow prescribed treatment for any of Plaintiff's impairments can become an issue in a case, the ALJ was required to find that Plaintiff was disabled because of his impairments or a combination of other impairments. The regulations at 20 C.F.R. §§ 404.1530 and 416.930 provide that, in order to get benefits, an individual must follow treatment prescribed by his or her physician if the treatment can restore the ability to work, unless the individual has an acceptable reason for failing to follow the prescribed treatment.

Implicit in the ALJ's decision is a premise that Plaintiff did not show sufficient justification for his failure to comply with the medication regimen and that continued treatment would restore Plaintiff's ability to work (Tr. 26, 27, 28). However, the ALJ never tied the failure to follow the prescribed treatment with Plaintiff's disability. At the administrative hearing, Plaintiff was given an opportunity to illustrate justifiable causes for his failures to comply with the medication regimen (Tr. 680). Plaintiff failed to establish that such treatment was not prescribed, that he lacked the need

23

for treatment or that the severity of his impairments was not remediable when following the prescribed course of treatment (Tr. 680). There is no issue of whether or not the ALJ improperly denied Plaintiff's claim based on the failure to follow prescribed treatment.

### 4. FAILURE TO INCORPORATE THE ME'S RESIDUAL FUNCTIONAL CAPACITY IN THE HYPOTHETICAL QUESTION.

Plaintiff suggests that the ALJ erred by failing to include the evidence provided by the ME into the hypothetical question posed to the VE. Plaintiff does not specify which of the ME's restrictions were not included in hypothetical posed to the VE.

In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. *Scott v. Commissioner*, 2013 WL 237296, at *18 (*citing Mousseau v. Commissioner of Social Security*, 2012 WL 271379, *5 (E.D.Mich., 2012) (unreported) (*citing Ealy v. Commissioner of Social Security,* 594 F.3d 504, 516 (6th Cir.2010)). Without an actual depiction of the limitations, the VE will not be able to accurately access whether jobs do exist for the claimant. *Schroeder v. Commissioner of Social Security*, 2012 WL 7657831, *18 -19 (N.D.Ohio,2012) (*citing Lamtman v. Commissioner of Social Security*, 2012 WL 2921705, *14 (N.D.Ohio,2012)). The hypothetical question need not reflect unsubstantiated allegations by the claimant. *Id.* An ALJ needs only to incorporate into the hypothetical question, limitations that he or she accepts as credible. *Petro v. Astrue*, 2009 WL 773283, *4 (E.D.Ky.2009) (*citing Sias v. Secretary of Health and Human Services*, 861 F.2d 475, 480 (6th Cir.1988)).

Here, Plaintiff's contention that the ALJ failed to explicitly incorporate Dr. Krosky's residual functional capacity is inaccurate. Dr. Krosky's testimony was focused, in large part, on transforming Plaintiff's impairments into a reasonable residual functional capacity finding. Dr.

Krosky concluded that Plaintiff should refrain from (1) pushing and pulling with his arms and legs; (2) climbing using a ladder, rope, scaffold, stairs or ramps; (3) crouching; (4) balancing; and (5) extreme temperatures, heights or driving. The ALJ took into account all of these limitations and impairments as they were medically undisputed and determined that they could seriously affect Plaintiff's ability to engage in alternate employment. The hypothetical question posed to the VE takes into account the "residual functional capacity" provided by Dr. Krosky (Tr. 703).

### 5. STEP FIVE DETERMINATION

Finally, Plaintiff alleges that of the three jobs available to him–inspector, ticket checker, order clerk–the VE did not distinguish whether the job incidence figures cited included part-time work within the numbers. Plaintiff argues further that failure to make this distinction is not harmless error and the case must be remanded to make that determination pursuant to SSR 96-8p and the Court's own *Kane v. Astrue*, 2011 WL 353866, *5 (N.D. Ohio, 2011).

At step five of the sequential evaluation, the ALJ must determine whether a claimant is able to do any "other work" in the national economy, given his age, education, work experience, and residual functional capacity. 20 C.F.R. § 416.920(a)(4)(v). If a claimant can make the transition to other work, the ALJ must then demonstrate that this other work exists in **significant numbers** in the national economy. 20 C.F.R. § 416.920(c).

Prior to the enactment of SSR 96–8p, the Sixth Circuit regarded part-time work as "substantial work activity," thus permitting an ALJ to conclude that a claimant was capable of working even if the claimant's residual functional capacity only permitted him to work part-time. *Janda v. Commissioner of Social Security,* 2013 WL 3200611, *7 (N.D.Ohio,2013) (*See Conn v. Secretary of Health & Human Services*, 51 F.3d 607, 610 (6ᵗʰ Cir.1995); *see also Davis v. Secretary of Health & Human Services*, 915 F.2d 186, 189 (6ᵗʰ Cir.1990)). But, SSR 96–8p changed this line

of thinking and required the ALJ's residual functional capacity to be based on the claimant's ability to perform full-time work. *Id.* (*See DeRossett v. Astrue*, No. 7:09–CV–00046, 2009 WL 4169489, at \*5 (E.D.Ky. 2009)).  SSR 96–8p is only relevant to step five of the sequential process because it relates to the ALJ's determination of residual functional capacity which is used to determine whether an individual is capable of performing other work in the event that he is unable to perform past relevant work or in situations where the claimant has no past relevant work.  SSR 96-8p is silent as to the testimony of a VE and whether the expert may offer both full- and part-time positions when describing other available work.  *Id.*

The undersigned Magistrate is not persuaded that the ALJ is required to consider the number of part-time jobs based upon the case law cited by Plaintiff.  In *Kane v. Astrue*, 2011 U.S. Dist. LEXIS 85332 (N.D. Ohio 2011), there was evidence that seriously called into question Ms. Kane's ability to complete a normal workday and workweek.  *Kane*, 2011 U.S. Dist. LEXIS 85332 at \*14. As such, this Court vacated the ALJ's decision and ordered the Commissioner, on remand, to consider the Plaintiff's capacity for full time work, as it related to a step five determination.  *Id.* at \*14-15.  The Magistrate construes that Court's finding as an indicator that the ALJ can deny benefits only if he or she finds that the claimant is capable of some form of full-time work.  The Court did not find that only full-time jobs could constitute significant work in the national economy.

In *Janda v. Commissioner of Social Security,* 2013 WL 3200611, \*8 (N.D. Ohio 2013), United States District Court Judge Sarah Lioi noted that Janda did not identify a rule or regulation that directed the ALJ to make a residual functional capacity finding based on the ability to perform part-time jobs.  However, she remanded the case to the Commissioner to consider the medical evidence that strongly suggested that Janda could not sustain full-time work.  On remand, Janda had

the burden to show that he was unable to sustain full-time employment.  Judge Lioi was not persuaded that it was *per se* error for the ALJ to accept the VE's testimony despite his inability to definitively state whether the job incidence figures included part-time employment.

The Magistrate finds that as a practical matter, there is uncertainty regarding government data sources and whether they contain part-time job information.  Some VEs have averred that the number of part-time jobs can be calculated by resorting to outside sources, revealing yet another practical problem when placing such a requirement on the step five analysis.  Relevance of part-time work at step five of the sequential evaluation is a question that the Commissioner has failed to adequately address.  At this juncture, the Magistrate declines to find that it was error for the ALJ to accept the VE's testimony despite the failure or inability to state whether the job incidence figures included part-time employment particularly since there is no medically determinable evidence that Plaintiff lacked the capacity for full-time work.

### IX.  CONCLUSION

The ALJ considered the entirety of Plaintiff's medical evidence, applied the correct legal standards in reaching his decision and substantial evidence supports that conclusion.  For these reasons, the undersigned Magistrate Judge concludes that the ALJ's finding that Plaintiff had not been under a disability, as defined in the Act, from September 6, 2004 through December 29, 2011, is supported by substantial evidence.  Accordingly, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   October 22, 2013

27